UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JAMIE SURRETT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-CV-0246-CVE-SAJ |
| ) | |
| CENTRAL AND SOUTH WEST ) | |
| CORPORATION, CENTRAL AND SOUTH ) | |
| WEST CORPORATION EMPLOYEE'S ) | |
| DISABILITY INCOME PLAN, and ) | |
| BROADSPIRE SERVICES, INC., ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Plaintiff Jamie Surrett ("Surrett") filed this action to recover benefits and enforce her rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 et seq. ("ERISA"). Plaintiff challenges the decision by defendants to terminate her long-term disability ("LTD") benefits under the Central and South West Corporation Employees' Disability Income Plan ("CSW Plan" or "Plan").

### I.

Surrett was employed by Public Service Company of Oklahoma ("PSO"), formerly a wholly owned subsidiary of Central and South West Corporation ("CSW"), as a telephone service representative ("TSR") from approximately October 20, 1996 to May 17, 2000. As a CSW employee, Surrett was a participant in the CSW Plan.

Section 2.15 of the Plan defines "Total Disability as:

a disability which the Committee determines (i) is the result of a Participant's sickness or injury that began or occurred while he was a Participant, (ii) requires the regular treatment of a duly qualified physician, and (iii) may reasonably be expected to prevent the Participant (A) from performing the material duties of his specific job with a Company for a period of up to 24 months immediately following the

>expiration of his Benefit Waiting Period and (B) from engaging in any occupation after such 24-month period for which he is reasonably qualified by training, education, background or experience.

Dkt. # 17, Ex. A, Plan, at 3. The provision concerning a participant's inability to perform his or her specific job is called the "own occupation" provision. The provision concerning a participant's inability to perform any occupation is known as the "any occupation" provision. A participant's participation in the Plan terminates when his or her employment with the company is terminated "for any reason (including retirement) other than Total Disability." Id. at 5.

During the relevant time period, Kemper National Services, Inc. ("Kemper"), which later became Broadspire Services, Inc. ("Broadspire"), administered the Plan. Under the CSW Plan,

>The Claims Administrator will be responsible for the initial review, payment, and/or denial of claims for benefits . . . . In carrying out its responsibilities under the Plan, the Claims Administrator will have the authority and discretion to (i) resolve all questions relating to the eligibility of Employees to become or continue as Participants, (ii) determine the amount of benefits payable to Participants and determine the time and manner in which such benefits are to be paid, (iii) construe and interpret the Plan, supply omissions from, correct deficiencies in, and resolve ambiguities in the language of the Plan and adopt rules for the administration of claims that are not inconsistent with the terms of the Plan, (iv) compile and maintain all records it determines to be necessary, appropriate or convenient in connection with the administration of the Plan, and (v) resolve all questions of fact relating to any matter for which it has administrative responsibilities.

Id. at 9.

In approximately July 1998, Surrett claims that she began suffering pain. Her primary care physician, Thomas Auxter, D.O., diagnosed her with fibromyalgia, major depression, and chronic fatigue syndrome. See Administrative Record ("Adm. Rec.") at 18, 24. Surrett left PSO on May 17, 2000. On July 20, 2000 she submitted her application for LTD benefits under the Plan. Id. at 501-03. In her application, she listed fybromyalgia, myofacial syndrome, chronic pain, and chronic fatigue as her illnesses.

2

On January 5, 2001 Kemper advised plaintiff that she did not meet the definition of "own occupation" under the Plan. Adm. Rec. at 501. Surrett appealed the denial of LTD benefits on February 12, 2001. Id. at 586-99. Kemper notified Surrett on March 27, 2001 that it had completed its review of her appeal and that it would institute benefits effective November 1, 2000. Id. at 604-05. Kemper informed Surrett at this time that her claim would be re-evaluated should the disability extend beyond the twenty-four month mark. Id. On July 25, 2002, Kemper notified plaintiff that her benefits under the "own occupation" definition for disability would end on January 11, 2003 and that to remain eligible for continued benefits, she had to meet the "any occupation" definition of disability. Id. at 540. She was asked to complete medical forms or, in the alternative, send her treating physicians' most recent medical records. Id.

Plaintiff's treating physicians and defendant's reviewing physicians came to different conclusions regarding the severity of plaintiff's medical condition and whether she was able to work. Plaintiff's treating physicians found that plaintiff could not work as a result of her condition. According to Dr. Auxter, Surrett was and is "100% disabled for life – No exceptions!" Id. at 24. In his medical opinion, Surrett should not work due to the amount of serious medication she takes on a daily basis. He claimed that she was incapable of work of any kind due to her severe limitation of cognitive, emotional, behavioral, and physical problems. Id. at 613. According to medical statements completed by Dr. Auxter, Surrett could work zero hours in a day. The medical statements also stated that, if she were to work, she would miss four days of work each month. Id. at 922, 921.

Other doctors that treated plaintiff also concluded that her physical and psychological problems were debilitative. Varsha Sikka, M.D., diagnosed plaintiff with fibromyalgia, chronic

3

myofacial strain, and major depression. According to Dr. Sikka's Attending Physician Statement, plaintiff had marked limitations of physical functional capacity. Id. at 617. William Ried, M.D., filled out a Mental Residual Functional Capacity Questionnaire ("RFC") that stated that Surrett was unable to meet competitive standards on most mental abilities needed to perform unskilled competitive work. Id. at 830-35. Cheryl Mallon conducted a Vocational Evaluation/Transferable Skills Analysis on Surrett. Her report stated that plaintiff's "physical and mental limitations are not consistent with competitive employment and make [her] permanently and totally disabled from performing any work." Id. at 721-24.

By contrast, defendant's reviewing physicians concluded that plaintiff's medical condition was not so severe as to keep her from working. On November 15, 2002, Surrett underwent an Independent Medical Evaluation by Horace Lukens, Jr., Ph.D., a psychologist. He agreed with plaintiff's treating physicians that she suffered from major depression and anxiety. He stated that her Global Assessment of Functioning ("GAF")[1] was a 30, lower than even plaintiff's treating physicians' assessments. Nonetheless, Dr. Lukens concluded that she could endure sedentary employment. Id. at 635. In his report, he also stated, "Examination of the patient's SIRS profile suggests elevations characteristic of individuals that are feigning a mental disorder and is rarely seen in clients responding truthfully." Id. at 638-39.

According to several evaluations conducted by defendants' physicians, plaintiff was capable of engaging in work. Her Functional Capacity Evaluation stated that plaintiff had "the ability to perform at the sedentary level." Id. at 662. Plaintiff's medical file, including the FCE, was sent to

---

[1] GAF is measured on a scale of 0 - 100. A score of 100 represents the highest level of psychological, social, and occupational functioning.

4

a vocational expert to conduct an Employability Assessment Repot to determine if there were any jobs that plaintiff could perform. The evaluation identified plaintiff as having transferable skills that would fit into a semi-skilled level of employment, such as a collection clerk, civil service clerk, or customer complaint clerk. Id. at 719-20.

On November 25, 2003, Kemper advised plaintiff that she did not satisfy the "any occupation" definition of disability and that her benefits would be terminated as of January 1, 2004. Id. at 577-79. She appealed that decision, but Broadspire (formerly Kemper) upheld its decision to terminate LTD benefits. Id. at 837-40. Broadspire based its determination on plaintiff's medical records and reports by "peer review physicians." Id. at 852-77. Each peer review physician, after reviewing the evaluations from her treating physicians, concluded that plaintiff was not functionally or psychologically incapable of performing some work.[2]

On September 22, 2004, plaintiff filed a second appeal. Id. at 890. Broadspire again sought peer review of two physicians who concluded the Surrett did not meet the "any occupation" definition under the Plan. Vaughn Cohan, M.D., provided a peer review in neurology and determined that "the documentation provided fails to demonstrate objective evidence of a functional impairment which would preclude the claimant from performing 'any secondary occupation' from 12/31/03." Id. at 928. Dr. Cohan also expressly rejected the medical diagnoses of plaintiff's

---

[2]   Barry Glassman, M.D., a psychiatrist, concluded: "there is no current information relevant to January 2004 that provides exam data that supports functional impairment of sufficient intensity and severity as to preclude this woman from performing core elements of any occupation." Adm. Rec. at 855. According to Sheldon Meyerson, M.D., "from a neurosurgical point of view there is no objective data to support that functional impairment exists that would preclude the claimant from performing any occupation as of January 1, 2004." Id. at 859. Curtis Schwartz, M.D., a urologist, reached the same conclusion. Id. at 866.

5

physicians Dr. Auxter and Dr. Sikka. Id. at 927- 28.  Dr. Glassman provided a peer review in psychiatry.  After considering the documents pertaining to plaintiff's psychiatric health, he concluded, "the submitted psychiatric information . . . failed to provide exam data that would support a functional impairment in the cognitive, behavioral or emotional spheres that would preclude this woman from performing the core elements of any work from 12/31/03 to the present." Id. at 932.

Plaintiff's final appeal was denied on November 17, 2004.  On June 14, 2004, plaintiff elected to take her retirement benefits in lump sum. Dkt. # 17, Ex. B.

## II.

On April 22, 2005, plaintiff filed suit, alleging defendants violated 29 U.S.C. § 1132 in denying her claim for benefits.  As a plan beneficiary, plaintiff has the right to federal court review of benefit denials and terminations under ERISA.  Specifically, section 1132(a)(1)(B) grants her the right to bring a civil action to recover benefits or to enforce her rights under the terms of the Plan. A denial of benefits challenged under section 1132(a)(1)(B) is to be reviewed under an arbitrary and capricious standard[3] when a plan gives the administrator, or other fiduciary, discretionary authority to determine eligibility for benefits or to construe the terms of a plan.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

Indicia of arbitrary and capricious actions include lack of substantial evidence, mistake of law, bad faith, or conflict of interest by the fiduciary.  Caldwell v. Life Ins. Co. of North America, 287 F.3d 1276, 1283 (10th Cir. 2002) (citing Sandoval v. Aetna Life and Cas. Ins. Co., 967 F.2d

---

[3]   "Abuse of discretion" and "arbitrary and capricious" are interchangeable terms for a standard that is deferential to the Plan administrator.

377, 380 n.4 (10th Cir. 1992)). Under the two-tier "sliding scale" approach adopted by the Tenth Circuit, an "additional reduction in deference is appropriate" where there is an inherent or proven conflict of interest. Fought v. Unum Life Ins. Co. of America, 379 F.3d 997, 1006 (10th Cir. 2004). It is plaintiff's burden to show such a conflict exists. If such a conflict is shown, "the plan administrator bears the burden of proving the reasonableness of its decision pursuant to [the Tenth Circuit's] traditional arbitrary and capricious standard." Id. However, plaintiff has not presented evidence that defendants acted under a conflict of interest with regard to her LTD claims so as to warrant less deference to their decision. Therefore, conflict of interest is simply weighed as one factor in determining whether there is an abuse of discretion. Id. at 1005.

The determinative inquiry in this case is whether defendants' decision is supported by substantial evidence. "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker]. Substantial evidence requires more than a scintilla but less than a preponderance." Sandoval, 967 F.2d at 382 (internal citations and quotation marks omitted). The Court considers the record as a whole, Caldwell, 287 F.3d at 1282, but the Court considers only that information available to the plan administrator at the time the decision was made. Hall v. Unum Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002). An administrator's decision "need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [the administrator's] knowledge to counter a claim that it was arbitrary and capricious." Woolsey v. Marion Labs., Inc., 934 F.2d 1452, 1460 (10th Cir. 1991).

The Court must also "take into account whatever in the record fairly detracts from the weight of the evidence in support of the administrator's decision." Washington v. Shalala, 37 F.3d 1437,

7

1439 (10th Cir. 1994) (internal citations and quotation marks omitted). The Court gives less deference to an administrator's conclusions if the administrator fails to gather or examine relevant evidence. Kimber v. Thiokol Corp., 196 F.3d 1092, 1097 (10th Cir. 1999); see Caldwell, 287 F.3d at 1282. Yet, the Court "will not set aside a benefit committee's decision if it was based on a reasonable interpretation of the plan's terms and was made in good faith." Trujillo v. Cyprus Amax Minerals Co. Ret. Plan Comm., 203 F.3d 733, 736 (10th Cir. 2000).

### III.

ERISA was enacted to protect contractual rights and, consequently, the terms of the Plan dictate. See Firestone, 489 U.S. at 113. The Plan grants the administrator discretion to determine eligibility. As a Plan participant, plaintiff has the responsibility to present evidence of continuing disability to qualify for LTD benefits. The focus for this Court is whether defendants were reasonable to deny plaintiff's LTD benefits given the evidence of her medical condition.

Plaintiff claims that the medical reports and diagnoses that she relies upon are more accurate than those relied upon by defendants because they come from treating physicians. See Dkt. # 16, at 7. Plaintiff argues that "controlling weight should be given to Plaintiff's treating sources rather than contracted physicians who tend to be more biased or have a conflict of interest." Dkt. # 16 at 8. However, in Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003), the Supreme Court unanimously held that ERISA does not contain a treating physician rule. Medical information offered by a Plan participant's primary physician is to be considered, but it is not entitled to special deference. Id. at 832. The Supreme Court held that ERISA does not require plan administrators to favor opinions of treating physicians given that "if a consultant engaged by a plan may have an incentive to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a

8

finding of 'disabled.'" Id. In addition, courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physicians' evaluation." Id. at 834.

Further, plaintiff argues that the fact that she has been awarded Social Security/Disability benefits should be considered as evidence of her disability precluding employment. Dkt. # 16, at 8. The determination of disability under the Social Security regime cannot be equated with the determination of disability under the ERISA regime. See Nord, 538 U.S. at 832. Unlike the mandatory, nationwide Social Security program, "[n]othing in ERISA requires employers to establish employee benefits plans." Lockheed Corp. v. Spink, 517 U.S. 882, 887 (1996).

Defendants thoroughly reviewed plaintiff's LTD claim before terminating her benefits and at every stage of appeal. They relied on the professional medical assessments of numerous doctors who, after reviewing plaintiff's treating physicians' reports, found no medical reason to preclude plaintiff from returning to work. There is ample evidence in the administrative record to support defendants' conclusion that plaintiff was capable of "any occupation" for which she was reasonably qualified. Defendants' decision to terminate plaintiff's LTD benefits, under the "any occupation" standard, was supported with substantial evidence. Therefore, defendants were reasonable to uphold the termination of plaintiff's LTD benefits.

## IV.

In summary, defendants' decision to terminate plaintiff's LTD benefits was an exercise of the discretion granted by the Plan.  Viewing the record as a whole, defendants relied on substantial evidence to conclude that plaintiff did not meet the Plan's definition of disabled for "any occupation."  The Court finds that defendants' decision to terminate plaintiff's LTD benefits after January 1, 2004 was a "reasoned application" of the terms of the Plan.  See Allison v. Unum Life Ins. Co. of America, 381 F.3d 1015, 1022 (10th Cir. 2004).

**IT IS THEREFORE ORDERED** that defendants' final decision to terminate plaintiff's LTD benefits is hereby **affirmed**.

**DATED** this 29th day of September, 2006.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT